UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

LYDELL HARRIS,

                Petitioner,

                                    **OPINION & ORDER**
                                    **CV-06-1337**

    -against-

DALE ARTUS,

                Respondent.
----------------------------------------------------------X
FEUERSTEIN, J.

On May 20, 2002, a judgment of conviction was entered against Lydell Harris (petitioner) in the Supreme Court of the State of New York, Kings County (Gerges, J.), upon a jury verdict finding him guilty of murder in the second degree (N.Y. Penal Law § 125.25(2)) and imposition of sentence to an indeterminate term of imprisonment of twenty-five (25) years to life. On March 20, 2006, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth herein, the petition is denied and the proceeding is dismissed.

II.     BACKGROUND

    A. Factual Background

    The following facts were taken from the trial transcript:

    On April 10, 1996, Larry Amerose (Amerose) died as a result of multiple knife wounds

1

inflicted by his friend Lydell Harris (petitioner). (T. 163, 219-220, 491, 494). Three (3) years before the incident, petitioner began dating Monique Lloyd (Lloyd). (T. 492). Ten (10) months prior to the incident, petitioner learned that Amerose was "infatuated" with Lloyd and that the two had been dating. (T. 202, 492). During the late winter of 1995, following a brief encounter between petitioner, Amerose and Lloyd, Amerose moved to Florida. (T. 203).

Upon returning from Florida in the spring of 1996, Amerose called petitioner to request a music tape. (T. 163, 206). When Amerose went to the Coney Island apartment where petitioner and Lloyd lived together, petitioner and Amerose went upstairs and began to fight about Lloyd, who remained downstairs. (T. 210-212, 217, 493). Petitioner provided the following written statement about the incident, which was read at the trial:

> I admit, I hit him [Amerose] first and I just couldn't stop. I tried but I couldn't. Then we tumbled around in the living room and I always kept the machete by the equipment so after we tumbled he was on top, and he beat me up some, and I grab [sic] the machete with my left hand. I was screaming stop but he won't listen [sic]. Next thing I know [sic] I cut him. He stopped breathing. (T. 491, 494).

Lloyd, however, offered a slightly different account of the incident. (T. 218-220). Lloyd testified that although she was not present for the events leading up to Amerose's death, she had witnessed the actual murder. (T. 218-220). Lloyd testified as follows:

> [Amerose] was on his knees, and [petitioner] was standing beside him. . . . [Amerose] was saying "you're going to do this? Don't do this. You're going to do this over her?" [Petitioner] was saying, "you fucked with my girlfriend. You disrespected me. . . ." [Amerose] offered his jewelry to [petitioner] and [petitioner] snatched it. The last words [Amerose] said were, "Think about your son," and then [petitioner] just started hitting him with the machete. (T. 219-20).

2

Petitioner testified that shortly after Amerose's death, he called Lloyd upstairs to help him clean up the blood, tie up Amerose, and carry Amerose's body downstairs to the bathroom. (T. 218, 227, 496). Once the body was in the bathtub, Lloyd held it steady while petitioner used a machete to cut the corpse into seven (7) pieces. (T. 231-240, 496). Petitioner then loaded the body parts into several black plastic bags. (T. 236, 390). While preparing to dispose of the body, petitioner admitted to several people that he had killed Amerose, including: Lloyd, his mother, his friend Kevin Davis (Davis), and the neighbor Pam King. (T. 228-229, 244, 381, 451, 494-496). At the trial, all of those witnesses testified that petitioner had admitted to the murder. (T. 218-220, 373, 451, 494-496, 511). Davis also helped petitioner clean up Amerose's blood, purchased a grocery cart from the store to transport the body, and loaded the garbage bags, containing body parts, into a duffle bag, which he and petitioner placed into the grocery cart. (T. 245-247, 390-396). Petitioner and Lloyd then walked the grocery cart to the ocean and disposed of some of the body parts near the dividing gate at Coney Island and the rest of the body parts near Kaiser Park. (T. 248-250, 496).

On April 16, 1996, six (6) days after the incident, Amerose's torso washed up on the shore of Coney Island. (T. 178). Two (2) days later, Amerose's arms and legs washed up on the same shore. (T. 179). On May 26, 1996, Amerose's trunk was discovered. (T. 179). Amerose's head was never found. (T. 179).

B. Relevant Trial Proceedings

During the trial, the prosecutor elicited specific testimony about the dismemberment of Amerose's body. (T. 233-240). Specifically, the prosecutor asked Lloyd to recall the number of

3

times petitioner hit Amerose's arms, legs, neck, and mid-section with the machete before severing each body part. (T. 233-240). Lloyd described the incident in gruesome detail, explaining that, "the arm came off, and he threw it on the ground where the leg was at . . . there was blood everywhere." (T. 234). The prosecutor further inquired about the precise way Lloyd held Amerose's head before decapitation and the number of times petitioner hit Amerose's neck before putting the head into a garbage bag. (T. 238).

Amerose's aunt, who did not witness the murder, or identify the body, was permitted to testify concerning the family's efforts to locate the body. (T. 178-82). She explained that the family searched morgues, hospitals, train stations, and bus stops. (T. 178). She also described the traumatic events leading up to the discovery of Amerose's trunk, torso, and appendages. (T. 178). She further testified about the family's decision to conduct a funeral for Amerose, despite the missing head. (T. 178).

On cross-examination, Lloyd testified that petitioner had been in prison and that she had testified in court against him previously. (T. 286). The defense counsel asked Lloyd, "[A]s you say, this is not the first time that you have testified about this, correct?" and Lloyd responded, "No." (T. 286). Later he asked, "[Y]ou look pretty good today?" and she responded, "Yes, five years later, with him behind bars, I look damn good." (T. 322). At the end of the trial, the judge instructed the jury about the former statements: "Now, you have heard testimony about a prior proceeding. You are not to speculate as to any prior proceeding, and draw no inference from any prior proceeding." (T. 813).

4

### C. Procedural History

On May 20, 2002, a judgment of conviction was entered against petitioner in the Supreme Court, Kings County (Gerges, J.), upon a jury verdict finding petitioner guilty of murder in the second degree in violation of N.Y. Penal Law § 125.25(2) and imposition of sentence of an indeterminate term of imprisonment of twenty-five (25) years to life.

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds: (1) that the prosecutor improperly elicited evidence of the dismemberment of Amerose's body and the attempts of his family to locate him; and (2) that evidence that petitioner had been convicted and sentenced at the first trial and remained incarcerated pending the second trial undermined the presumption of innocence. On June 7, 2004, the Appellate Division affirmed the judgment of conviction on the grounds that petitioner's claims were unexhausted and, in any event, were without merit. People v. Harris, 8 A.D.3d 402, 777 N.Y.S.2d 762 (2d Dept. 2004). On August 23, 2004, the New York Court of Appeals denied leave to appeal the order of the Appellate Division. People v. Harris, 3 N.Y.3d 675, 784 N.Y.S.2d 14, 817 N.E.2d 832 (2004).

On or about May 3, 2005, petitioner filed a petition for a writ of error coram nobis to vacate the June 7, 2004 order of the Appellate Division on the ground of ineffective assistance of appellate counsel. By order dated November 7, 2005, the Appellate Division denied petitioner's application for a writ of error coram nobis, finding that petitioner failed to establish that he was denied the effective assistance of appellate counsel. People v. Harris, 23 A.D.3d 398, 803 N.Y.S.2d 435 (2d Dept. 2005). On November 3, 2006, the New York Court of Appeals denied petitioner's application for leave to appeal the order of the Appellate Division denying his

5

application for a writ of error coram nobis, finding that there was "no question of law presented which ought to be reviewed by the Court of Appeals * * *." People v. Harris, 7 N.Y.3d 902, 826 N.Y.S.2d 611, 860 N.E.2d 73 (2006).

On March 20, 2006, petitioner filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging (1) that the prosecutor improperly elicited evidence regarding the dismemberment of Amerose's body and the attempts of his family to locate him; and (2) that evidence that petitioner had been convicted and sentenced at the first trial and remained incarcerated pending the second trial undermined the presumption of innocence. By order dated March 15, 2007, petitioner's request to amend his petition to assert a claim of ineffective assistance of trial counsel was denied and his request to amend the petition to assert a claim of ineffective assistance of appellate counsel was granted. On March 27, 2007, petitioner filed an amended petition to include a claim of ineffective assistance of appellate counsel in accordance with the March 15, 2007 Order.

III. DISCUSSION

    A. The AEDPA

        1. Exhaustion

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner must "exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or that] circumstances exist that render such process ineffective to protect the rights of the [petitioner].'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808

(2d Cir. 2000) (citing Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971)). There is no dispute that petitioner exhausted his claims in state court.

### 2. Procedurally Defaulted Claims

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, unless the prisoner can demonstrate, "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-50, 111 S.Ct. 2546, 115 L.Ed.2d 1109 (1991). The state court's reliance on state law must be "clear from the face of the opinion." Fama, 235 F.3d at 809 (citation omitted).

If a state court holding contains a plain statement that a claim is procedurally defaulted then the federal habeas court may not review it, absent cause and prejudice or a "fundamental miscarriage of justice," even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

#### a. Evidentiary Claims

At the trial, no objection was made regarding the three (3) evidentiary claims alleged in the petition: (1) that the prosecutor improperly elicited evidence regarding the dismemberment of

Amerose's body, (2) that the prosecutor improperly elicited evidence regarding efforts by Amerose's family to locate his body, and (3) that evidence of petitioner's conviction at the first trial undermined the presumption of innocence. (T. 233-9). The Appellate Division found all three (3) claims unpreserved for appellate review. People v. Harris, 8 A.D.3d 402, 777 N.Y.S.2d 762 (2d Dept. 2004) (holding that the defendant's contention that the prosecutor improperly appealed to the jury's sympathy by eliciting gruesome testimony about the dismemberment of the body was not preserved for appellate review and that the plaintiff's remaining contentions were also unpreserved for appellate review); see N.Y. C.P.L. § 470.05(2). Accordingly, petitioner's evidentiary claims were all denied in state court on an independent and adequate state law procedural ground. Since petitioner has not asserted any cause for his procedural default in state court or any resulting prejudice, and has not alleged that a failure to consider these claims will result in a "fundamental miscarriage of justice," i.e. that he is innocent of the crime for which he was convicted, each of the three (3) evidentiary claims are precluded from federal habeas review.

3. Standard of Review

Under the AEDPA, a federal court may grant a writ of habeas corpus to a prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court adjudication on the merits is defined as one that "(1) disposes of the claim on the merits,

and (2) reduces its disposition to judgment." Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. 2254(d)(1). Alternatively, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. 1495. Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

### a. Ineffective Assistance from Appellate Counsel

In order to prevail on a Sixth Amendment claim, the petitioner must prove that the attorney's representation, (1) "fell below an objective standard of reasonableness," measured under "prevailing professional norms," and that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the procedures

9

would have been different." Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Strickland test applies to appellate as well as trial counsel. See, e.g. Smith v. Robbins, 528 U.S. 259, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). A petitioner alleging ineffective assistance of appellate counsel must prove both: (1) that it was objectively unreasonable for appellate counsel to fail to raise a particular issue on appeal, and (2) that absent appellate counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful. See, e.g. Smith, 528 U.S. at 285; Aparicio v. Artuz, 269 F.3d 78, 95 (2nd Cir. 2001).

With respect to the first prong, whether counsel's performance was reasonable, the petitioner must overcome the strong presumption that counsel's conduct falls within "the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. Counsel's performance must be given a "heavy measure of deference," and considered according to the counsel's perspective at the time. Id. at 690-91. A petitioner may not rebut the strong presumption of effective assistance of counsel merely by arguing that appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness. Id. at 689. The first step toward determining whether counsel erred is to eliminate the "distorting effects of hindsight" and consider the law and facts during the period in question. See Strickland, 466 U.S. at 491.

On May 20, 2002, a judgment of conviction was entered against plaintiff finding him guilty of depraved indifference murder in the second degree. (T. 1). During the trial, all parties agreed that the jury instructions and verdict sheet would include "murder in the second degree depraved indifference." (T. 1, 737). On appeal, petitioner's appellate

counsel made a strategic decision to pursue three (3) alleged errors at the trial level: (1) the admission of evidence regarding the dismemberment of Amerose's body, (2) the admission of evidence about efforts to find the body parts, and (3) the admission of evidence about petitioner's prior conviction. These claims were valid, pertinent, and well-argued in the appellant counsel's brief. (Appellate Brief 25, 40). Petitioner contends that his appellate counsel should have also argued that the trial court and his trial counsel erred by allowing the jury to be instructed on the elements of both the intentional murder and depraved indifference murder. According to petitioner, under the facts of this case, he could have only been found guilty of intentional murder, not depraved indifference murder.

The seminal New York case upon which petitioner relies is People v. Payne, 3 N.Y.3d 266, 786 N.Y.S.2d 116, 819 N.E.2d 634 (2004), wherein the New York Court of Appeals found that depraved indifference murder should not be charged in an "overwhelming majority of homicides that are prosecuted in New York." 3 N.Y.3d at 270, 786 N.Y.S.2d 116. However, Payne was not decided until two (2) years after petitioner's judgment of conviction and four (4) months after the Appellate Division affirmed the judgment of conviction.

Prior to 2003, when the New York Court of Appeals decided People v. Haffeez, 100 N.Y.2d 253, 762 N.Y.S.2d 572, 792 N.E.2d 1060 (2003), the New York courts almost consistently upheld charging the jury with both depraved indifference murder and intentional murder. See e.g., People v. Sanchez, 98 N.Y.2d 373, 748 N.Y.S.2d 312, 777 N.E.2d 204 (2002); People v. Register, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d

704 (1983).[1] It was only beginning in 2003 that the holdings of Register and Sanchez were progressively weakened. In the first such case, Hafeez, the New York Court of Appeals found the evidence legally insufficient to support the defendant's conviction of depraved indifference murder. Haffeez, 100 N.Y.2d at 256. However, only the concurring opinion of Judge Rosenblatt noted the potential limiting effect that case had on the holdings of Sanchez and its progeny. Id. Prior to Payne, and at the time petitioner's appellate brief was filed, the appellate courts almost uniformly remained steadfast to Sanchez and distinguished Hafeez. See e.g., People v. Garbutt, 9 A.D.3d 255, 780 N.Y.S.2d 126 (1st Dept. 2004); People v. Martin, 8 A.D. 3d 883, 780 N.Y.S.2d 640 (3rd Dept. 2004); People v. Wilkens, 8 A.D.3d 1074, 778 N.Y.S.2d 252 (4th Dept. 2004).

People v. Gonzalez, 1 N.Y.3d 464, 775 N.Y.S.2d 224, 807 N.E.2d 273 (2004), the next significant New York Court of Appeals case on this issue, was decided three (3) months after petitioner's appellate counsel filed the appellate brief on petitioner's behalf. The New York Court of Appeals did not decide Payne, which provided the definitive definitions of intentional murder and depraved indifference murder upon which petitioner relies as the basis for his claim of ineffective assistance of appellate counsel, until October 2004, four (4) months after the Appellate Division affirmed petitioner's judgment of conviction.

---

[1] Both Sanchez and Register were not explicitly overruled until 2006, when the New York Court of Appeals decided People v. Feingold, 7 N.Y.3d 288, 819 N.Y.S.2d 691, 852 N.E.2d 1163 (2006).

Finally, even assuming, *arguendo*, that petitioner's depraved indifference/intentional murder claim was colorable during the pendency of his appeal, it was well within his appellate counsel's discretion to omit that weaker argument in favor of the stronger evidentiary claims. Jones v. Barnes, 463 U.S. 745, 752, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). Requiring appellate counsel to bring every potentially valid claim on appeal would, "undermine the ability of counsel to present the client's case in accord with counsel's professional evaluation." Id. At the time of petitioner's appeal, Sanchez and its progeny were still the applied law in New York, and it was, thus, objectively reasonable for appellate counsel to omit this weaker issue and instead pursue the significantly stronger evidentiary issues on appeal. Thus, appellate counsel's strategy was well within the range of professionally reasonable judgments.

The state court's decision that petitioner "failed to establish that he was denied effective assistance of appellate counsel," should be given substantial deference, People v. Harris, 23 A.D.3d 398, 803 N.Y.S.2d 435 (2005), and is not contrary to, or an unreasonable application of, clearly established federal law. Accordingly, habeas relief is not warranted with respect to petitioner's claim of ineffective assistance of appellate counsel.

IV. CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also

13

Miller-El v. Cockrell, 537 U.S. 322 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: September 22, 2008
      Central Islip, New York